

ENTERED
06/17/2020

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **GAIL THOMAS WHITCOMB** | § | **CASE NO: 17-31692** |
| **Debtor(s)** | § | |
| | § | **CHAPTER  7** |
| | § | |
| **GAIL THOMAS WHITCOMB,** *et al* | § | |
| **Plaintiff(s)** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 17-03199** |
| | § | |
| **PAULL & PARTNERS-LOCKE LANE,** *et al* § | | |
| **Defendant(s)** | § | |

## <u>MEMORANDUM OPINION</u>

Gail Thomas Whitcomb filed a lawsuit in state court against Paull & Partners-Locke Lane, *et al.* to: (i) enjoin the defendants from foreclosing on his alleged homestead based upon an unpaid loan balance owed to Paull & Partners, LLC by Mr. Whitcomb; (ii) declare Paull & Partners' lien on the property void; and (iii) assert other related causes of action.  Mr. Whitcomb removed the state court lawsuit to this Court after he filed chapter 13 bankruptcy.

Paull & Partners moved for summary judgment on Mr. Whitcomb's claims, arguing that:

(i)     Mr. Whitcomb's property lost its protection as his homestead under Texas law after Mr. Whitcomb conveyed the property to Waterdog 77019, LLC;

(ii)    If the property did not lose its homestead protection, Paull & Partners' interest in the property would be subrogated to any liens securing any valid loans on the homestead paid with the proceeds of its loan; and

(iii)   If any of its liens were unenforceable, any principal and interest owed to Paull & Partners under the loan may not be forfeited.

On March 20, 2019, the Court granted Paull & Partners' motion for summary judgment in part and denied it in part.  The Court held that: (i) issues of fact existed on the issue of whether the conveyance constituted a pretended sale, (ii) Paull & Partners had at least constructive

knowledge that the Whitcombs were not conducting a legitimate business under Waterdog; (iii) Paull & Partners was entitled to contractual subrogation; and (iv) Mr. Whitcomb remained personally liable for the principal and interest due on the property under the Note.  All other claims against Paull & Partners were dismissed.

On September 25, 2019, Mr. Whitcomb filed a motion to reconsider based on this Court's ruling in favor of Paull & Partners on the issue of contractual subrogation.  Mr. Whitcomb, relying largely on *Zepeda v. Fed. Home Loan Mortg. Corp*., 935 F.3d 296 (5th Cir. 2019), argues that just like in *Zepeda*, the deed of trust at issue here is invalid, which therefore precludes a finding of contractual subrogation.  Thereafter, on September 26, 2019, Paull & Partners filed a brief for final hearing and a response to Mr. Whitcomb's motion, both of which opposed the relief requested.

On October 3, 2019, the Court held an evidentiary hearing on the three remaining issues: (i) whether the conveyance of the property from the Whitcombs to Waterdog is void as a pretended sale under Article XVI, § 50(c) of the Texas Constitution; (ii) whether Paull & Partners had a duty of inquiry regarding the use of the property prior to providing a loan; and (iii) whether Paull & Partners is entitled to equitable subrogation.  Closing arguments took place on October 11, 2019.

For the reasons set forth below, the Court finds the following:

(i)      the Whitcombs failed to meet their burden of demonstrating that the conveyance of their interests in the property to Waterdog was a pretended sale in violation of the Texas Constitution as to the initial $800,000.00 in loan proceeds;

(ii)     the Whitcombs met their burden of establishing a pretended sale for the additional $75,000.00 as part of Waterdog's loan modification and extension;

    (iii)      Subject to his bankruptcy discharge, Mr. Whitcomb is personally liable under his guaranty for the principal and interest due on the Property under the Note.

## **Background[1]**

Gail and Patricia Whitcomb purchased a home at 3011 Locke Lane (the "Property") in 2003.  (ECF No. 20 at 4).  The Whitcombs financed the purchase of the Property with two loans.  The first loan was from Cadence Bank, N.A. and was secured by a first lien deed of trust.  (ECF No. 20 at 5).  The second loan was from Gail Whitcomb's grandmother, Geraldine Whitcomb and was secured by a second lien deed of trust.  (ECF No. 20 at 5).  Geraldine Whitcomb was a co-owner of the Property.  (ECF No. 20 at 5).  Eventually, Mr. Whitcomb's grandmother released her deed of trust and transferred her interest in the Property to the Whitcombs.  (ECF No. 20 at 5).

The Whitcombs experienced financial difficulties in 2014.  As a result, the Whitcombs modified their loan with Cadence Bank.  (*See* ECF No. 20-5).  Even after the modification, the Whitcombs struggled to pay property taxes on the Property.  (ECF No. 20 at 5).  In search of further relief, the Whitcombs turned to a tax lien lender, Hunter-Kelsey II, LLC, which loaned the Whitcombs the money to pay off the tax liens against the Property.  (ECF Nos. 20 at 5; *see* 20-8).  The terms of the tax loan subrogated the taxing authority's interest in the Property to Hunter-Kelsey II.  (ECF No. 20 at 5).  Despite this short-term relief, the Whitcombs were left with the same financial issues they began with in 2014 when they first sought the Cadence Bank loan.  (ECF No. 20 at 5).

Much of the Whitcombs' financial difficulties can be traced to a family dispute that arose when Mr. Whitcomb's grandmother passed away.  (*See* Case No. 17-03209; ECF No. 9 at 2).

---

[1] A substantial portion of this background section was written in reliance on the parties' briefing.  It is included solely for background.  The statements in this background section do not constitute findings by the Court.

After Geraldine Whitcomb's death, Mr. Whitcomb and his aunt, Jeriann Kolber, clashed over control of the estate's significant assets.[2]  (Case No. 17-03209; ECF No. 9 at 2).  After engaging in significant litigation, the parties entered into a global settlement agreement, which required binding arbitration to resolve any future disputes.  (Case No. 17-03209; ECF No. 9 at 2).  One such dispute arose between the Whitcombs and Ms. Kolber in 2013.  (Case No. 17-03209; ECF No. 9 at 3).  The dispute was resolved through binding arbitration, and in September 12, 2016, the arbitrator awarded Ms. Kolber a significant victory.  (Case No. 17-03209; ECF No. 9 at 3).

In 2016, Mr. Whitcomb—under the belief that he could vindicate his rights and his claim to his grandmother's estate—attempted to overturn the arbitration award through additional litigation.  (*See* Case No. 17-03209; ECF No. 9 at 3 (alleging that the arbitration award "is unenforceable for a number of reasons")).  Mr. Whitcomb's efforts proved both costly and unsuccessful.

In July 2015, prior to contacting Paull & Partners, Mr. Whitcomb reached out to Jet Lending, LLC for a loan.  (*See* ECF Nos. 38 at 19; 48 at 5).  Although the discussions between Mr. Whitcomb and Jet Lending never materialized into a loan, Jet Lending referred Mr. Whitcomb to David Gold, who was a loan broker at the time.  (ECF Nos. 38 at 23; *see* 48 at 6 (noting "Mr. Buriak at Jet Lending introduced [Mr. Whitcomb] to Mr. Gold")).  At some point after Jet Lending's referral, Mr. Whitcomb retained Mr. Gold as his consultant for the purpose of obtaining a loan secured by the Property.  (October 3, 2019 Hearing at 11:15 a.m.).  The professional relationship between Mr. Whitcomb and Mr. Gold, who did business as Belmont

---

[2] Mr. Whitcomb, like Ms. Kolber, were heirs to Geraldine Whitcomb's estate.  (Case No. 17-03209; ECF No. 9 at 2).  Additionally, both Mr. Whitcomb and Ms. Kolber were "co-trustees of the Geraldine Coed Whitcomb Revocable Trust [] and partners of the Geraldine Whitcomb Partnership, Ltd. . . . ."  (Case No. 17-03209; ECF No. 9 at 2).

Franklin Group, was memorialized in a Finder's Fee Agreement (the "Agreement").  (*See* ECF No. 48 at 6; October 3, 2019 Hearing at 11:12 a.m.).

In August 2015, in accordance with the Agreement, Mr. Gold, as Mr. Whitcomb's consultant, contacted Paull & Partners, LLC to obtain a loan based on the Property's equity.[3] (*See* ECF Nos. 22 at 2; *see* 38 at 35 ("So I[4] received a phone call followed by an email from Mr. Gold, who is a broker, saying the [Property] has this much value.  The borrower wants this much [of a] loan and based on the numbers [it was a] yes.")); (*see also* October 3, 2019 Hearing at 11:18 a.m.).  Paull & Partners' business is based on providing loans to people in the real estate business who want to build homes for sale or rent, or those involved in the "house flipping" industry who need loans to facilitate the renovation and resale of residential home and properties. (ECF No. 38 at 32–33).  Therefore, Paull & Partners alleges that it is only in the business of providing commercial loans to companies and does not provide home equity loans to individuals, or provide personal loans, generally.  (ECF No. 38 at 33).

In August 2015, Mr. Whitcomb formed a Texas limited liability corporation under the name "Waterdog 77019, LLC."  (ECF No. 38 at 10).  Waterdog's certification of formation, along with the company agreement, named Gail Thomas Whitcomb as the sole owner and member of the corporation.  (*See* ECF Nos. 20-1; 20-10).  On September 1, 2015, shortly after

---

[3] Mr. Gold testified that Paull & Partners, LLC was one various of lenders he considered at the time for the Whitcombs' loan on the Property.  (October 3, 2019 at 11:17 a.m.)  Mr. Gold noted that prior to the Whitcombs, he had brought other borrowers to Paull & Partners.  (October 3, 2019 Hearing at 11:11 a.m.).  Mr. Gold estimated he brought Paull & Partners approximately eight or ten buyers over the course of two to two and half years between 2013 and the end of 2015.  (October 3, 2019 Hearing at 11:11 a.m.).

[4] The excerpt is testimony provided by Alan Paull.  (ECF No. 38 at 35).  Alan Paull formed Paull & Partners, LLC in 2009.  (ECF No. 38 at 2).

Waterdog's formation, the Whitcombs transferred their interests in the Property to Waterdog through a special warranty deed. (ECF Nos. 20-11; 22 at 2).[5]

The parties dispute the reason for Waterdog's formation. The Whitcombs claim that Waterdog was formed at the insistence of Paull & Partners, or its agents, as a prerequisite for funding what the Whitcombs describe as a home equity loan on the Property for the purpose of paying off debts owed on the Property. (ECF No. 22 at 2). Although, Paull & Partners concedes that it knew Waterdog was a recently formed LLC prior to granting the corporation a loan, it portrays the formation of an LLC for the purpose of home acquisition as a commonly accepted practice in the house flipping industry. (ECF No. 38 at 38–49). It denies that it told Mr. Whitcomb to form an LLC for the purpose of obtaining a loan. Paull & Partners, therefore, maintains that it has a valid lien on the Property, given that the loan was presented to it and appeared to be just like any other one of its many previously issued commercial loans.

The loan closed on September 4, 2015, shortly after Waterdog's formation and only three days after the Whitcombs' conveyance of their interests in the Property to Waterdog. (ECF Nos. 20 at 6; 22 at 2). Pursuant to the terms of the loan, Paull & Partners provided $800,000.00 to Waterdog.[6] (ECF No. 20 at 6). In exchange, Mr. Whitcomb signed a promissory note and a deed of trust, in his capacity as Waterdog's managing member. (ECF No. 20 at 6). Mr. Whitcomb also signed a personal guaranty as a requisite for funding the loan. (ECF Nos. 20 at 6; *see* 20-13). The loan proceeds were paid to Cadence Bank $443,729.45 to release its purchase

---

[5] Ms. Whitcomb has at all times maintained that at the time she signed the deed, her "understanding was that [the transaction] was going to help [the Whitcombs'] financial situation with regard to [their] payments on [the] house and other expenses . . . ." (ECF No. 38 at 76).

[6] Alan Paull testified that prior to making the $800,000.00 loan to Waterdog, Paull & Partners made a $17,000.00 loan to Mr. Whitcomb, secured by jewelry, for the purpose of paying the Whitcombs' children's school expenses. (October 3, 2019 Hearing at 9:28 a.m.). Mr. Paull, however, also testified that approval of the $17,000.00 loan to Mr. Whitcomb came at a time when Mr. Paull had already agreed to make the $800,000.00 loan to Waterdog. (October 3, 2019 Hearing at 11:36 a.m.).

money mortgage on the Property and $45,406.54 to Hunter-Kelsey II to release the tax relief agency's interest in the Property.  (ECF No. 20 at 6).  The remaining $310,864.01 of the loan proceeds remained with Waterdog.

After the initial loan from Paull & Partners, charges against the Property for $5,947.54 in homeowner's association assessments were unpaid.  (ECF No. 20 at 6).  Consequently, Waterdog contacted Paull & Partners in December 2015 to obtain a loan modification and extension.  (ECF No. 20 at 6).  The parties agreed to increase the outstanding principal of the loan by $75,000.00.  (ECF No. 20 at 6).  As part of the extension, Mr. Whitcomb signed a non-homestead affidavit on December 23, 2015, which stated that Waterdog was the sole owner of the home and would not claim a homestead exemption over the Property.  (ECF Nos. 20 at 6; 20-21; *see* 38 at 15 (noting the document titled "Non-Homestead and Homestead Designation" bore Mr. Whitcomb's signature)).[7]  The $75,000.00 was used to pay off the homeowner's association assessment, but Paull & Partners retained a portion of the funds to make pending interest payments due under the loan.  (ECF No. 20 at 6).[8]

On July 26, 2016, without Paull & Partners' knowledge, Mr. Whitcomb, in his capacity as member and owner of Waterdog, deeded the Property from Waterdog back to the Whitcombs.

---

[7] The Non-Homestead and Homestead Designation indicates that Mr. Whitcomb signed the document in his role as manager of Waterdog 77019, LLC.  (*See* ECF No. 20-21).

[8] The Loan Modification and Extension notes:

> Out of the remaining proceeds, $22,113.28 will be applied to the ad valorem taxes now due with the respect to the Property and $5,947.54 will be applied to past due homeowner's association dues and fees.

(ECF No. 20-18 at 3).  At trial, Mr. Paull testified that the $22,113.28 was intended to be paid to the property tax authorities at closing, but those were never paid.  He blamed Todd Taylor, his attorney at the time, for the oversight.  (October 8, 2019 Hearing at 9:55 a.m.).

(ECF No. 20 at 7).  The Whitcombs claim to have executed this transfer to claim a homestead exemption on the Property and thereby reduce their property tax assessments.  (ECF No. 22 at 4).

The Waterdog loan went into default when the Whitcombs failed to make the required payments.  (ECF No. 20 at 7).  In December 2016, Paull & Partners gave notice of its intent to foreclose on the Property.  (ECF No. 20 at 7).  The Whitcombs filed suit in state court and obtained a temporary injunction on February 2, 2017, which prevented Paull & Partners from foreclosing on the Property under the Waterdog Deed of Trust.  (ECF No. 20 at 7).  Mr. Whitcomb filed chapter 13 bankruptcy and this suit was removed to this Court on March 31, 2017, as part of Mr. Whitcomb's personal bankruptcy proceeding.  (ECF No. 22 at 4); (*see also* Case No. 17-31692).

The Whitcombs allege that they have continuously occupied the Property since 2003 and maintained the Property as their homestead throughout that time.  (ECF No. 22 at 1).  The Whitcombs' suit against Paull & Partners alleges that the transfer of the Property from the Whitcombs to Waterdog was a pretended sale with a condition of defeasance that is void under the Texas Constitution.  (ECF No. 22 at 5).  Without a valid sale to Waterdog, the Whitcombs argue that Paull & Partners has no lien or interest in the Property.  (ECF No. 22 at 5).

Paull & Partners filed a motion for summary judgment, arguing that the Property lost its homestead character upon transfer to Waterdog, and further that the conveyance is not a pretended sale under Texas law based on the Whitcombs' intent to convey title and the absence of a condition of defeasance, both of which are required for a pretended sale under Texas law. (ECF No. 20 at 8–12).  Alternatively, Paull & Partners claims that in the event that the conveyance is deemed a pretended sale, it is subrogated to the rights of the creditors whose liens

were extinguished using the loan proceeds of its loan to Waterdog—that is Cadence Bank and Hunter-Kelsey II. (ECF No. 20 at 13–14).

Concurrent with Paull & Partners' motion for summary judgment, the Trustee filed an objection to Mr. Whitcomb's claimed homestead exemption to the Property. (*See* Case No. 17-31692; ECF No. 156). The Trustee seeks to limit Mr. Whitcomb's homestead exemption to $160,375.00 under 11 U.S.C. § 522(p)(1)(A) because Mr. Whitcomb acquired the Property from Waterdog within the 1215-day period before filing his bankruptcy petition. (*See* Case No. 17-31692; ECF No. 156 at 7).

On August 30, 2018, the Court held an evidentiary hearing and oral arguments to determine:

(i)     Whether the conveyance of the Property from the Whitcombs to Waterdog is void as a pretended sale under Article XVI, § 50(c) of the Texas Constitution; and

(ii)    If the conveyance of the Property is void as a pretended sale:

a.      What rights, if any, Paull & Partners has against Mr. Whitcomb and the estate; and

b.      What liens, if any, Paull & Partners holds against the Property.

(ECF No. 24 at 2). At the conclusion of the testimony, the Court issued a preliminary ruling. The Court held that the transaction did not fit within the traditional pretended sale paradigm because it was not done at Paull & Partners' insistence. (ECF No. 38 at 89). However, the evidence also demonstrated that the Whitcombs intended to reclaim the Property in their own names. (ECF No. 38 at 89). The Court requested additional briefing regarding whether a pretended sale may exist without a duty of inquiry from the lender. (ECF No. 38 at 89–90). The Court abated the Trustee's objection, pending the sale of the Property. (ECF No. 38 at 96).

On March 20, 2019, the Court granted Paull & Partners' motion for summary judgment in part and denied it in part.  (*See* ECF No. 36).  On the issue of whether the transfer qualified as a pretended the sale, the Court noted that: (i) issues of fact existed regarding the requirement of Whitcomb's intent to transfer title to Waterdog; (ii) under the facts as they were presented, a condition of defeasance could exist; and (iii) testimony demonstrated that Paull & Partners had at least constructive knowledge that the Whitcombs were not conducting a legitimate business under Waterdog.  This knowledge may have imposed a duty of inquiry on Paull & Partners and supported the Whitcombs' contention that the conveyance was a pretended sale.  (ECF No. 36 at 18).  The Court, however, held that Paull & Partners was entitled to contractual subrogation given that the proceeds of the loan were used to pay off a lien arising from purchase money and a tax lien, neither of which fall within Texas' broad homestead protection laws.  (ECF No. 36 at 19).[9]  Moreover, Mr. Whitcomb remained personally liable for the principal and interest due on the Property under the Note, even if the conveyance were deemed a pretended sale.  (ECF No. 36 at 19, 21).  All other claims against Paull & Partners were dismissed.  (*See* ECF Nos. 36 at 21; *see* 20 at 15).

The Court set an evidentiary hearing for April 25, 2019, on the remaining factual issues.  (ECF No. 36 at 21).  By agreement of the parties, the evidentiary hearing was extended and converted to status conference set for May 24, 2019, which was later re-set to June 14, 2019.  (*See* ECF Nos. 41–42).  At the status conference, the Court set trial for October 3, 2019.

On September 25, 2019, Mr. Whitcomb filed a motion to reconsider.  (*See* ECF No. 46).  Mr. Whitcomb, relying largely on *Zepeda v. Fed. Home Loan Mortg. Corp*., 935 F.3d 296 (5th Cir. 2019), argues that Paull & Partners is not entitled to contractual subrogation in light of the

---

[9] In light of its finding that Paull & Partners is entitled to contractual subrogation, the Court did not address equitable subrogation.  (ECF No. 36 at 21).

deed's invalidity. (ECF No. 46 at 2–3). Mr. Whitcomb further claims that Paull & Partners is not entitled to equitable subrogation, because it knew that the transfer to Waterdog was a pretended sale. (ECF No. 50 at 2).

On September 26, 2019, Paull & Partners filed a brief for final hearing and a response to Mr. Whitcomb's motion, both of which opposed the relief requested. (*See* ECF Nos. 48–49). Paull & Partners maintains that the Whitcombs have failed to satisfy their burden of establishing a pretended sale. (ECF No. 48 at 9–11). Specifically, Paull & Partners contends that relying solely on Mr. Whitcomb's testimony to find a pretended sale is erroneous and contrary to legal principles. (ECF No. 48 at 11 ("If both elements of a pretended sale . . . can be established by nothing more than the property owner's subsequent statement of an unexpressed intent, then there is nothing left of those long-standing legal principles.")). Paull & Partners further distinguishes *Zepeda* from the issues at play in the case before the Court. (*See* ECF No. 48 at 14). Paull & Partners argues that *Zepeda* does not apply, because *Zepeda* dealt with a home equity loan, rather than a pretended sale, and the lender in that case knew the loan contained a deficiency—a violation under Article XVI, § 50(a)(6) of the Texas Constitution—which the lender failed to correct within the statutorily required 60-day time frame after notice from the borrower. (ECF No. 48 at 14). Thus, it argues that the Whitcombs' reliance on *Zepeda* is misplaced.

That same day, Mr. Whitcomb filed a reply to Paull & Partners' response, and further requested a continuance. (*See* ECF No. 50). The Court denied Mr. Whitcomb's motion for continuance. (*See* ECF No. 51).

On October 3, 2019, the Court held an evidentiary hearing on the three remaining issues:

(i)  Whether the conveyance of the Property from the Whitcombs to Waterdog is void as a pretended sale under Article XVI, § 50(c) of the Texas Constitution;

(ii)  Whether Paull & Partners had a duty of inquiry; and

(iii)Whether Paull & Partners is entitled to equitable subrogation.

(October 3, 2019 Hearing at 9:00–11:55 a.m.).  Closing arguments took place on October 11, 2019.

## Jurisdiction

The District Court has jurisdiction over this proceeding under 28. U.S.C. § 1334(a).  Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

## Analysis

### I.  Pretended Sale

The Texas Constitution provides homeowners with robust protection against forced sales and liens through homestead exemptions.  Tex. Const. art. XVI, § 50(a).  Liens encumbering homestead property that fail to comply with the Texas Constitution are null and void.  *Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542, 545 (Tex. 2016).  Parties may not contract around the homestead protections provided under the Texas Constitution.  *Id*.  Once a property is characterized as a homestead, its homestead character is lost only after death, abandonment, or alienation.  *In re Perry*, 345 F.3d 303, 310 (5th Cir. 2003) (citing *In re Moody*, 862 F.2d 1194, 1198 (5th Cir. 1989)).

One transaction which the Texas Constitution renders void is a pretended sale with a condition of defeasance.  Tex. Const. art. XVI, § 50(c); *Perry*, 345 F.3d at 310.  Parties to a pretended sale do not intend for title to vest in the purchaser. *John T. Hardie & Co. v. Campbell*,

63 Tex. 292, 295 (Tex. 1885).  A pretended sale must also contain a condition of defeasance, which allows "the seller to reclaim title to the property conveyed after the loan is repaid." *Perry*, 345 F.3d at 313.

*Burden of Proof*

"The claimant has the initial burden of establishing homestead status." *Perry*, 345 F.3d at 311 (citing *Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 568 (Tex. 1972)).  "This is accomplished by presenting evidence of both: (i) overt acts of homestead usage and (ii) an intent to claim the land as a homestead." *Perry*, 345 F.3d at 311.  There is no question that the Property was the Whitcombs' homestead prior to the initial conveyance.  (October 11, 2019 Hearing at 2:30 p.m.–2:32 p.m.) (making a distinction between the Whitcombs' rights prior to and after the conveyance to Waterdog, the Court stated: "The evidence is clear.  This was always the Whitcombs' homestead")).  "Once the claimant has made a *prima facie* case in favor of homestead status, the objecting party has the burden of demonstrating that the homestead rights have been terminated." *Perry*, 345 F.3d at 311 (citations omitted); *see Rubarts v. First Gibraltar Bank, FSB*, 896 F.2d 107, 110 (5th Cir. 1990) ("Once it is established that the property is a homestead, there is a presumption that the homestead status continues unless terminated.").

Here, the Whitcombs are asserting their homestead rights to challenge the validity of Paull & Partners' lien on the Property, arguing that they have not lost their homestead interest in the Property because the conveyance of their interests in the Property to Waterdog was a pretended sale—a transaction which is a void under Texas law.  (ECF No. 22 at 1, 18).

The Whitcombs carry the burden of demonstrating that the conveyance to Waterdog was a pretended sale under Texas law.

Paull & Partners argues that the Property lost its homestead status by virtue of alienation, and therefore the Whitcombs cannot use their homestead status to challenge the validity of its lien on the Property.  (ECF No. 20 at 8–10 ("Mr. and Mrs. Whitcomb conveyed or 'alienated' the Property to Waterdog 77019, LLC.")).  Paull & Partners is careful to distinguish alienation from abandonment.  (ECF No. 20 at 8).  "When a homestead is conveyed to a corporation, the stock of which is owned by the grantors, the property loses its homestead character regardless of whether the grantors continue to occupy the property."  *Perry*, 345 F.3d at 311 (citing *Nash v. Conatser*, 410 S.W.2d 512, 521–22 (Tex. Civ. App. 1966)).  "Valid title then vests in the corporation, and the property becomes subject to the debts of the corporation."  *Id*.  The burden of demonstrating that the Property has lost its homestead character falls on Paull & Partners.  *Id.* ("Once the claimant has made a *prima facie* case in favor of homestead status, the objecting party has the burden of demonstrating that the homestead rights have been terminated.").

Accordingly, although the Whitcombs carry the burden of demonstrating that the conveyance of their interests in the Property to Waterdog constitutes a pretended sale under Texas law, Paull & Partners carries the burden of establishing that the Property has lost its homestead character, such that the Whitcombs may not use their purported homestead interest in the Property to challenge the validity of Paull & Partners' lien on the same.

*Arguments & Evidence*

The Whitcombs maintain that they never intended to transfer title to Waterdog, and that the conveyance was done at Paull & Partners' insistence and direction, as a prerequisite for funding the loan.  (ECF No. 22 at 8–9).  Meanwhile, Paull & Partners emphasizes that a homeowner may lawfully convey property to her own corporation or company "for legitimate purposes other than creating income for the corporation by leasing it to themselves . . . ."  (ECF

No. 48 at 9).  Therefore, the conveyance from the Whitcombs to Mr. Whitcomb's wholly owned

corporation is not in and of itself a violation of the law.  As shown by the evidence, the transfer

is also not out of the ordinary.

Evidence presented both at the initial hearing on August 30, 2018, and at trial on October

3, 2019, demonstrate the following:

i.   Mr. Whitcomb, in an email to Jet Lending, LLC, first proposed the idea of
deeding the Property to a trust or entity to facilitate a loan.  (October 3,
2019 Hearing at 10:32 a.m.; *see* ECF No. 38 at 21 (quoting Mr.
Whitcomb's part in the email exchange: "Alex, I think we can deed the
property to a trust and lease it back from that legal entity so long as
Patricia and I are not the trustees, it should work")).

ii.   The communications between Mr. Whitcomb and Jet Lending occurred
prior to any communication or contact with Paull & Partners, LLC and at a
time when Mr. Whitcomb did not know about Paull & Partners or Alan
Paull.  (October 3, 2019 Hearing at 10:33 a.m.; *see* ECF No. 38 at 20).

iii.   Jet Lending referred Mr. Whitcomb to David Gold, who Mr. Whitcomb
then hired as his consultant for the purpose of obtaining a loan.  Mr. Gold,
in his role as Mr. Whitcomb's consultant, contacted various lenders
(including Paull & Partners) for the purpose of obtaining a loan based on
the Property's equity.  (October 3, 2019 Hearing at 11:15–11:20 a.m.).

iv.   Mr. Gold testified that prior to representing Mr. Whitcomb, he notified
Mr. Whitcomb that he only dealt with commercial loans.  (October 3,
2019 Hearing at 11:15–11:16 a.m. (attesting that he told Mr. Whitcomb: "I
do commercial or business loans on non-owner occupied, non-homestead
properties . . . and [the property has] to be in an LLC")).  Moreover, Mr.
Gold testified that in one of his initial conversations with Mr. Whitcomb,
Mr. Whitcomb indicated that: (i) he had initiated the procedure of forming
an LLC, (ii) part of the Property was already rented out to a family friend,
and (iii) the Whitcombs intended to move out of the home in order to rent
out other portions of the home as well.  (October 3, 2019 Hearing at 11:16
a.m.).

v.   Waterdog's formation, along with the recordation of the deed, occurred
shortly before Paull & Partners issued the loan to Waterdog.  (ECF No. 38
at 43 (noting the deed was recorded on September 2, 2015—two days
prior to the issuance of the loan)).  Moreover, at the time Paull & Partners
issued the loan to Waterdog, it knew that the corporation was a recently

formed entity.  (ECF No. 38 at 42–43 ("I knew it happened soon before the loan, right.")).

vi.      Mr. Whitcomb asked Woodrow Holland, an attorney and family friend, to prepare the documents, which facilitated the transaction—Waterdog's certificate of formation, deed, and the company agreement.  (October 3, 2019 Hearing at 9:18 a.m.).  Mr. Holland, however, did not represent Mr. Whitcomb in the initial loan transaction or during Waterdog's formation, and did not otherwise communicate with Paull & Partners or its attorney, Todd Taylor, in conjunction with the initial transactions.  (October 3, 2019 Hearing at 9:20 a.m.).

vii.     Prior to issuing the $800,000.00 loan to Waterdog, Paull & Partners issued a separate $17,000.00 loan to Mr. Whitcomb for the purpose of paying the Whitcombs' children's school expenses, despite Paull & Partners' insistence that it is not in the business of issuing personal loans.  The loan was secured by jewelry and was eventually repaid out of the proceeds of the $800,000 loan.  (October 3, 2019 Hearing at 9:28–9:31 a.m.).

viii.    Mr. Paull attested that, prior to Paull & Partners' issuance of the loan to Waterdog, he: (i) reviewed the appraisal report, (ii) drove by the home, (iii) and relied on both Mr. Taylor's experience and Mr. Gold's representations to approve the loan.  Mr. Paull, however, acknowledged that he did not otherwise independently inspect the Property even though Mr. Paull had notified Mr. Whitcomb earlier in time through email that he would conduct an inspection of the Property.  (October 3, 2019 Hearing at 10:09 a.m.).  Moreover, Mr. Gold attested that he told Mr. Paull that the Whitcombs intended to move out of the home, because "they needed the income."  (October 3, 2019 Hearing at 11:19 a.m., 11:36 a.m.)

ix.      At no time did Waterdog conduct any business, own a bank account, file taxes, sell goods or provide services.  (October 3, 2019 Hearing at 10:15 a.m.).

x.       In December 2015, Waterdog contacted Paull & Partners to obtain a $75,000.00 loan modification and extension.  (ECF No. 20 at 6).  On December 23, 2015, as part of the extension, Mr. Whitcomb signed a non-homestead affidavit, which stated that Waterdog was the sole owner of the home and would not claim a homestead exemption over the Property. (ECF Nos. 20 at 6; 20-21; 38 at 5).

xi.      Sometime after Paull & Partners issued the $800,000.00 loan to Waterdog, but prior to the $75,000.00 modification and extension, Mr. Holland, in his capacity as Mr. Whitcomb's attorney and at Mr. Whitcomb's direction, wrote an email to Mr. Paull in which Mr. Holland indicated that the Property was Mr. Whitcomb's homestead.  (October 3, 2019 Hearing at

9:20 a.m.).  Mr. Paull admitted receiving the email from Mr. Holland but noted that he did not take any steps to confirm or verify the information provided; rather, Mr. Paull forwarded the email to his attorney, Mr. Taylor.  (October 3, 2019 Hearing at 9:30 a.m.).

xii.  On July 26, 2016, without Paull & Partners' knowledge, Waterdog deeded the Property back to the Whitcombs.  (ECF No. 20 at 7).  The Whitcombs maintain that the transfer was made in order to claim a homestead exemption on the Property, for the purpose of reducing their property tax assessments.  (ECF No. 22 at 4).

Three things are clear from the evidence before the Court: (i) Mr. Whitcomb with purpose and a plan initiated contact with Paull & Partners, LLC for the purpose of obtaining a loan; (ii) although Paull & Partners did not have actual knowledge that the Whitcombs were living in the home at the time it issued the initial $800,000.00 loan to Waterdog, Paull & Partners consciously turned a blind eye to the transaction—it intentionally evaded any information which could have put it, or its agents, on notice of the Whitcombs' intent or the condition of the Property; and (iii) at the time Paull & Partner's approved the additional $75,000.00 as part of a modification and extension of the Waterdog loan, it was aware that the Whitcombs claimed the Property as their homestead.  Whether these three truths equal a pretended sale under Texas law is the issue before the Court.

### A.  The Initial Transaction: $800,000.00 to Waterdog

#### i.  *Intent to Transfer*

Mr. Whitcomb has maintained at all times that the purpose of the loan was to serve as a temporary fix for the Whitcombs' financial situation, which Mr. Whitcomb believed would be resolved—and the loan would be paid back in full—once the pending litigation with his aunt, Jeriann Kolber, ended with a finding in his favor.  (ECF No. 38 at 79).  Though the Court is wary

of placing any weight on Mr. Whitcomb's testimony,[10] the Whitcombs' actions demonstrate that they did not intend to move out the home, nor did they intend to transfer title to Waterdog. Though the Whitcombs have consistently attempted to shed responsibility and shift blame for the transfer, their intent remained consistent—they did not intend to "sell" the home to Waterdog. The Whitcombs' actions corroborate an intent to evade Texas homestead laws through a sham transfer to Waterdog for the purpose of obtaining a loan until their financial situation was fully resolved. The evidence shows that Paull & Partners did not have actual or constructive knowledge of the Whitcombs' intent.

*Perry v. Rubarts*

Paull & Partners contends that the controlling case here is *In re Perry*, 345 F.3d 303 (5th Cir. 2003). Paull & Partners—relying heavily on the Fifth Circuit's decision in *Perry*—argues that: (i) when the Whitcombs conveyed their interest in the Property to Waterdog through a special warranty deed, they alienated the Property and therefore lost their homestead status as to the home, (ii) the duty of inquiry applied in *Rubarts* does not apply here, and (iii) the conveyance at issue is "not the kind of pretended transaction that the Texas Constitution prohibits." *Perry*, 345 F.3d at 312.

The Court rejects Paull & Partners' contention that *Perry* is controlling in this instance for two reasons. First, in response to the borrower's argument that the conveyance was made at the suggestion of the lender, as the Whitcombs have done here, the Fifth Circuit distinguished its

---

[10] Mr. Whitcomb has failed to show consistency in testimony and pleadings before the Court. *Compare* (ECF No. 22 at 3 ("Before the Whitcombs approached Paull [& Partners] for a loan, they had never considered creating an LLC to hold their homestead property.")), *with* (October 3, 2019 Hearing at 10:32 a.m.; ECF No. 38 at 21 (quoting Mr. Whitcomb's email to Jet Lending: "Alex, I think we can deed the Property to a trust and lease it back from that legal entity so long as Patricia and I are not the trustees, it should work")). Throughout, Mr. Whitcomb's testimony was inconsistent. He lacks credibility.

prior decision in *Rubarts v. First Gibraltar Bank, FSB*, 896 F.2d 107 (5th Cir. 1990), from the

facts at issue in *Perry*:

> The issue in *Rubarts* was whether homestead claimants, after transferring their property to their wholly-owned corporation in order to facilitate a loan, secured by the property, could be estopped from challenging the validity of the lien (by asserting their homestead rights) as against the Bank after they reconveyed the property to themselves.  *Rubarts* is thus an estoppel case, not a pretended sale case.  Furthermore, *Rubarts* addresses the viability of the claimants' asserted homestead interest *as against the Bank from whom they took out the loan*, not as against a third-party purchaser, such as the Dearings, who were not involved in either the sale of the property to the corporation or the loan from the Bank.

*Perry*, 345 F.3d at 311–12 (emphasis in original).  The core issue in *Rubarts* and in this case is

the same: challenging the validity of a lender's lien through the assertion of a borrower's

homestead rights.  The Fifth Circuit in *Rubarts* dealt solely with the question of whether the

borrowers, the Rubartses, could assert their homestead rights as against the lender, First Bank, or

whether they lost that right (*i.e.* their homestead interests) through a conveyance to "their

wholly-owned corporation."  *Id*.  Paull & Partners raises the same issue here—it claims the

Whitcombs alienated their homestead through the conveyance of their interest to Waterdog, such

that they no longer may assert those interests or rights to challenge Paull & Partners' lien on the

Property.  Moreover, here, unlike in *Perry*, the Whitcombs *are* asserting their homestead

interests *as against a lender from whom they took out the loan,* not as against a third-party

purchaser.  *Perry*, 345 F.3d at 311–12.  The Fifth Court's reasoning for distinguishing *Rubarts*

from the facts at issue in *Perry,* therefore, is inapplicable here.  The Court declines to ignore

*Rubarts* as Paull & Partners contends it should.

Second, the Fifth Circuit in *Perry* held that the bankruptcy court's finding—that the

transfer at issue was legitimate as to the requirement of intent to transfer title—was not clearly

erroneous where: (i) the bank's loan officer on the transaction testified that "Perry had initiated

the idea of forming a corporation in order to limit his personal liability"; (ii) the bank would have made the loan in the absence of the transfer; and (iii) the title company officer's testimony demonstrated that "Perry was an honorable gentleman who would not engage in a sham transaction (as confirmed by testimony from Perry himself)." *Perry*, 345 F.3d at 313.[11]

The facts here are to the contrary. The record is devoid of any indication that Mr. Whitcomb intended Waterdog to carry-on any business or handle any transactions during its formation, nor is there any evidence that Waterdog conducted any business during the time of its formation. (ECF Nos. 22 at 3; 38 at 67 (noting that the Whitcombs did not pay Waterdog any rent for living in the home)); *(see also* October 3, 2019 Hearing at 10:21 a.m. (testifying that Waterdog "never owned a bank account, filed taxes, or sold and goods or services")). Moreover, all parties agree that Paull & Partners would not have made the loan without Waterdog's formation given the nature of the loan itself. (*See* October 3, 2019 Hearing at 11:16 a.m. (attesting that in his first few conversations with Mr. Whitcomb, Mr. Gold notified Mr. Whitcomb that a transfer of the Property to a limited liability company was required in order to obtain a loan from a commercial lender, such as Paull & Partners)). In fact, as counsel for Paull & Partners noted, Mr. Whitcomb, in an email to Jet Lending, first suggested the idea of creating an entity or trust for the sole purpose of obtaining a loan based on the Property's equity. (October 3, 2019 Hearing at 10:32 a.m.; *see* ECF No. 38 at 21 (quoting the email exchange: "Alex, I think we can deed the property to a trust and lease it back from that legal entity so long as Patricia and I are not the trustees, it should work")). If anything, *Perry* highlights, without placing a duty of inquiry, the importance of lender knowledge in a transaction where the validity

---

[11] The Court notes that the Fifth Circuit declined to rely on Perry's testimony. *Perry,* 345 F.3d at 312–13 ("In the absence of any evidence, other than the self-serving testimony of Perry, that the parties did not intend for title to vest in the corporation, the bankruptcy court's decision that the 1985 transfer of the 26-acre tract was legitimate was not clearly erroneous.")

of a lien is challenged.  *Perry*, 345 F.3d at 313 (relying heavily on testimony of the bank's agents rather than testimony from the borrower in finding the lien was valid).  Unlike the honorable Mr. Perry, Mr. Whitcomb did not purport to be a "gentleman who would not engage in a sham transaction," but rather admits that the "sham transaction" was of his own making.  (*See* ECF No. 22 at 3 (admitting that Waterdog is "a sham company")); (*see also* (October 3, 2019 Hearing at 10:32 a.m.)).

The Court reiterates its previous finding that the conveyance does not fit within the traditional pretended sale paradigm because it was not done at Paull & Partners' insistence. Moreover, adding to its particularity, here Paull & Partners chose to avert its eyes from the circumstances surrounding the conveyance, the Property, and the Whitcombs' actions or inactions.  Paull & Partners relied solely on the value of the Property against which it was taking a lien without investigation or verification.  As a consequence, this case does not fit within the confines of any other case cited by either party, nor has the Court found a similar case.  The Court will not ignore—as Paull & Partners chose to do—a sham transaction when it sees one.

The totality of the circumstances demonstrates that the Whitcombs had no intention of transferring valid title to Waterdog; rather, the Whitcombs intended to deceive by using a sham entity to own the Property that would be used as collateral for the purpose of obtaining the loan proceeds.

The Court will now address whether the Whitcombs lost their homestead rights through alienation.

### *Duty of Inquiry*

In its previous Memorandum Opinion, this Court, relying on the Fifth Circuit's holding in *Rubarts*, held that "Paull & Partners failed to satisfy its duty of inquiry regarding the alleged

pretended sale in question, further supporting the categorization of this transaction as a pretended sale." (ECF No. 36 at 18). In particular, this Court noted:

> The Fifth Circuit examined Texas case law and concluded that "a purchaser's or lender's duty of inquiry must be 'prosecuted as far as a prudent man.'" Applying this standard, the Fifth Circuit concluded that a party bore no duty of inquiry when transactions were valid on their face. However, a prudent person with knowledge of a "potential sham transaction," which seeks to hinder homestead protections (such as a pretended sale), imposes a duty of inquiry on the lender or purchaser regarding the "circumstances under which the purported sale was made."

(ECF No. 36 at 16–17) (internal citations omitted). As noted earlier, Paull & Partners attempts to distinguish *Rubarts* from the facts at issue in this case, arguing that in light of the Fifth Circuit's characterization of *Rubarts* as an "estoppel case" rather than a "pretended sale case," such duty of inquiry is inapplicable. Meanwhile, the Whitcombs reiterate this Court's holding that Paull & Partners failed to meet its duty of inquiry, further evidencing that the conveyance was a pretended sale and thus, in violation of Texas' homestead laws.

The Court leaves open the question of whether a duty of inquiry exists when a borrower attempts to void a lien based on a claim that the transaction is a pretended sale. The Court, however, finds that *Rubarts* stands for the proposition that courts should impose a duty of inquiry on a lender where the lender objects to a borrower's assertion of her homestead rights as a challenge to the validity of the lender's lien. *Rubarts v. First Gibraltar Bank, FSB*, 896 F.2d 107, 110 (5th Cir. 1990) ("First Texas, however, relies upon an estoppel theory, contending that the Rubartses' absolute conveyance of the property estops them from asserting their homestead rights."). In other words, under *Rubarts,* courts should analyze whether a lender complied with its duty of inquiry where the lender claims that a borrower has lost her homestead rights or interests through a conveyance of property to a corporation or entity, and therefore may not challenge the lender's lien through those purported rights or interests. *Rubarts*, 896 F.2d at 114

("We have noted that in accordance with *Eylar* and *Moore*, such constructive knowledge on the part of First Texas appears sufficient to invoke, for the Rubartses, the protection of the homestead laws.").

Paull & Partners challenges the Whitcombs' assertion of their homestead rights just as the First Texas, the bank and lender, did in *Rubarts*.  *Compare* (ECF No. 20 at 10 ("Under Texas law, therefore, the homestead designation terminated when the Property was conveyed to Waterdog 77019, LLC regardless of whether Mr. and Mrs. [Whitcomb][12] continued to occupy the Property.") (citations omitted)), *with Rubarts*, 896 F.2d at 110 ("First Texas, however, relies upon an estoppel theory, contending that the Rubartses' absolute conveyance of the property estops them from asserting their homestead rights.").  Paull & Partners may not have used the word "estoppel" in their claim, but the objective and substance is the same.

In addressing First Texas' claim, the Fifth Circuit noted:

> The question we address in the instant appeal, however, is whether the Rubartses' *execution* and recordation of a warranty deed conveying their residence in fee simple to Diversified is sufficient to estop their homestead claim.  The answer to this question is found in Texas authority dating well into the nineteenth century.  *First Texas would have us hold that a lienholder need only rely upon the recorded warranty deed as evidence of the grantor's intent to effect an absolute conveyance* and that the Rubartses are estopped from making their homestead claim.

*Rubarts*, 896 F.2d at 110 (emphasis added).  Notably, Paull & Partners asks the Court to do the same here.  It argues that the Court should look only to documents creating the conveyance—Waterdog's deed, certificate of formation, and company agreement—as evidence of the Whitcombs' intent to transfer title, and consequently, as evidence of the loss of their homestead rights and interests in the Property through alienation.  (*See* ECF No. 48 at 8 ("There is nothing in the conveyance documents, which were prepared by the Whitcombs' own attorney, that

---

[12] Paull & Partners' motion for summary judgment states "Mr. and Mrs. Berry", but the Court notes that this likely was a typographical error on Paull & Partners' part.  (ECF No. 20 at 10).

suggests the Deed was not intended to convey title.  And while the Whitcombs continued to

reside in the Property, the law is clear that this fact is insufficient to overcome the presumption

that a signed, recorded deed is valid.")).

The Fifth Circuit turned to Texas case law to resolve the issue.  *Rubarts*, 896 F.2d at 111–

12 ("The apparent inconsistency between *Eylar* and *Moore* concerns the scope of the duty of

inquiry placed upon the party asserting the validity of the lien.").   In rejecting, First Texas'

contention that the court should rely solely on a recorded warranty deed, the Fifth Circuit stated:

> *Eylar's* and *Moore's* prudent-person standard must be further explained in light of
> other, more general principles of Texas homestead law; thus, the prudent lender,
> in the context of a potential "sham" conveyance, will not rely upon the
> representations of husband and wife to the contrary; instead, the lender or
> purchaser must *investigate the circumstances under which the purported sale was
> made*, the status of the purchase, the arrangements made by the original owners
> for other housing, *or any affirmative actions indicating abandonment*.

*Rubarts*, 896 F.2d at 112 (emphasis added) (citing *Fuller v. Preston State Bank,* 667 S.W.2d 214,

217 (Tex. App.—Dallas 1983, writ. ref'd n.r.e.)).  Just as the Fifth Circuit did in *Rubarts*, the

Court rejects Paull & Partners' contention that it should only look to the recorded deed in

evaluating whether the Whitcombs have lost their homestead rights through alienation, and

consequently, their ability to challenge Paull & Partners' lien through those purported rights.

Rather, the Court finds that when a lender challenges the assertion of a borrower's homestead

rights and interests for the purpose of curtailing the borrower's claim that the lender's lien as

against the property is invalid, *Rubarts* imposes a duty of inquiry upon the lender.  A duty of

inquiry, which here, Paull & Partners resisted and ignored at all times during the loan process.

In light of the Court's previous holding that "Paull & Partners failed to satisfy its duty of

inquiry," the Court further finds that Paull & Partners failed to establish alienation, such that the

Whitcombs are precluded from asserting their homestead rights to challenge the validity of Paull

& Partners' lien on the Property.  (ECF Nos. 36 at 18; 48 at 11).  Accordingly, the Property did not lose its homestead status.

### ii.     *Condition of Defeasance*

The second requirement for a pretended sale is that it contain a condition of defeasance. Tex. Const. art. XVI, § 50(c); *Perry*, 345 F.3d at 313.  "Texas prohibits only those pretended sales that include a condition of defeasance." *Perry*, 345 F.3d at 312 (citing Tex. Const. art. XVI, § 50); *see John T. Hardie & Co. v. Campbell*, 63 Tex. 292, 295 (Tex. 1885) ("[I]t is not every sale of the homestead involving a condition of defeasance which [the Texas Constitution] declares shall be void; but it declares that all *pretended* sales involving such conditions shall be void.").  "A condition of defeasance allows a seller to reclaim title to the property after a loan is repaid." *Perry*, 345 F.3d at 312 (citation omitted).  It involves "an *understanding*, express or implied, between the grantors and grantee that when the purported notes and deeds have served their purpose, the homestead should be reconveyed to the grantors." *Anglin v. Cisco Mortg. Loan Co.,* 141 S.W.2d 935, 938 (Tex. 1940) (emphasis added).  "[A] condition of defeasance may be[] implied from other language in the conveyance, such that it was made to secure payment of a debt; or stated in a contemporaneous document, such as an option to repurchase on particular terms after the debt is paid." *Tittle v. Vanleer,* 34 S.W. 715, 722 (1986); *see Mosher Steel & Mach. Co. v. Nash,* 6 S.W.2d 158, 162 (Tex. Civ. App.—Dallas 1928, writ dism'd w.o.j.).

*Hardie* describes the difference between a condition of defeasance and a legitimate sale:

If it was intended by the parties that the title should vest in appellants by reason of the conveyance, but subject to be divested within the designated time by Campbell paying to appellants the specified amount, then such a transaction would amount to a sale, as contradistinguished from a *pretended* sale.

But, notwithstanding the form of the conveyance, if it was the intention of the parties that the title not vest in appellants, but the object and intention was to

secure them in the payment of a debt owing appellants by Campbell, then the transaction would amount to be a *pretended* sale involving a defeasance, which would render the deed invalid.

The real issue is . . . if the deed was executed and delivered by the one party, and received by the other, upon the understanding and with the intention that it should only be a security for a debt owing by Campbell to appellants, then it would be invalid.

*John T. Hardie & Co. v. Campbell*, 63 Tex. 292, 295 (1885) (emphasis in original).

The Texas Supreme Court's reasoning in *Hardie* is important for two reasons: (i) it emphasizes that the intention of the parties is critical to the determination of whether there a transaction constitutes a pretended sale, and (ii) in determining whether a condition of defeasance exists, *Hardie* highlights that the parties must have *had an understanding*, along with the intention, that the transaction was made for the purpose of securing a debt owed. *Id.* at 296.

Paull & Partners contends that the Whitcombs have not met their burden of establishing a condition of defeasance because the deed contains no such express condition, and in light of the deed's ambiguity it cannot be varied through parole evidence. (ECF No. 48 at 11). Moreover, Paull and Partners highlights the Whitcombs' own claim that Waterdog reconveyed the Property to the Whitcombs for the purpose of reducing property tax assessments, rather than because any condition under the loan agreement was triggered. (ECF No. 48 at 11).

The special warranty deed that conveyed the Property from the Whitcombs to Waterdog contained no condition of defeasance. (*See* ECF No. 20-11). The deed transferred the Whitcombs' "right, title, and interest" in the Property and made no reservations or express statements regarding a possibility of reconveyance of the Property upon repayment. (ECF No. 20–11 at 1); *see Paull & Partners Inv., LLC v. Berry*, 558 S.W.3d 802, 813 (Tex. App.—Houston [14th Dist.] 2018) ("Here, the General Warranty Deed does not contain an express condition of defeasance or other language from which such a condition could be implied."). Nor

does the record contain any evidence of other statements of an intent to reconvey the Property on certain terms after the debt is paid. *Berry*, 558 S.W.3d at 813.

Mr. Whitcomb concedes that no express condition evinces his intent to reclaim the Property but argues that an explicit written or oral agreement is not required to establish the presence of a condition defeasance. (ECF No. 22 at 11). A condition of defeasance may be implied. *See Anglin,* 141 S.W.2d at 938; *Tittle,* 34 S.W. at 722. "[W]hether to imply a condition of defeasance is ordinarily a question of fact." *Anglin,* 141 S.W.2d at 939–40; *see Berry,* 558 S.W.3d at 813.

"[I]n determining whether an instrument is to be construed as an absolute conveyance or a mortgage when there is no defeasance expressly agreed upon or recited in the deed, equity looks to all circumstances preceding and attending the execution of the instrument, and sometimes those which have subsequently occurred." *Anglin,* 141 S.W.2d at 939–40. Although tackling a different issue, as noted in this Court's discussion above, the Fifth Circuit in *Rubarts,* looked "to all circumstances preceding and attending the execution of the" loan in finding an understanding between the First Texas, the bank and lender, the Rubartses, the borrowers. *Rubarts v. First Gibraltar Bank, FSB*, 896 F.2d 107, 114 (5th Cir. 1990).

In that case, just as here, the borrowers conveyed their property to a corporation wholly owned by them and continued to use the home as their primary residence. *Rubarts*, 896 F.2d at 109. In *Rubarts*, however, "[p]rior to the conveyance, a vice-president of First Texas, Carnney Wilson, inspected and appraised the property, aware that it was the Rubartses' home." *Id.* Thereafter, once the corporation "received the loan proceeds, it paid off the prior first lien on the property, which First Texas itself held . . . ." *Id.* Most notably, the Fifth Circuit—citing a meeting between a loan officer and Bobby Rubarts, in which Rubarts proposed "borrowing

money in the name of his corporation" for the purpose of obtaining a second mortgage loan on

the home—highlighted the "longstanding relationship between the Rubartses and First Texas."

*Id*. at 113.  The Rubartses "had known the bank officers for many years, and the institution was

well aware of their business affairs."  *Id*.  Such relationship is further showcased in the moments

prior to the Rubartses' reconveyance of the property:

> Sometime after March 1979, *the Rubartses indicated to First Texas* that they
> wished to reconvey their residence for tax purposes, as they needed the federal
> income tax interest reduction from their *personal* income tax.  First Texas
> explained that in order to do so, they would need to negotiate a new loan.
> However, noticing that the deed of trust and conveyance did not preclude a
> reconveyance, the Rubartses did so anyway; in June 1980, Diversified, acting
> through the Rubartses as officers, reconveyed the property to them individually.

*Rubarts*, 896 F.2d at 109 (emphasis in original).  The Fifth Circuit found that it was clear from

the parties' interactions, previous to and subsequent to the loan, that First Texas had at least

constructive knowledge of the Rubartses' plan.  In other words, the parties had an *understanding*

of the Rubartses' intentions regarding the purpose of the loan proceeds.

The evidentiary record is devoid of any such understanding as to the initial transaction in

this case.  In contrast, here, Paull & Partners, or its agents, did not inspect the Property prior to

issuing the loan to Waterdog.  (*See* October 3, 2019 Hearing at 10:09 a.m.).  Moreover, the

Whitcombs admit that "shortly after obtaining the loan from Paull [& Partners]," Waterdog,

acting through Mr. Whitcomb, "transferred the Property back to the Whitcombs on July 26, 2016

. . . for property tax purposes" *without* Paull & Partners' knowledge.  (ECF No. 22 at 4).  Mr.

Gold also testified that in his initial conversations with Mr. Whitcomb, Mr. Whitcomb indicated

that: (i) he either was in the process of forming an LLC, or had the intention of forming an LLC;

(ii) the Whitcombs rented part of the Property to a family friend; and (iii) the Whitcombs

intended to move out of the home in order to rent the remaining portions of the Property for the

purpose of obtaining additional income.  (October 3, 2019 Hearing at 11:16 a.m.).  Mr. Gold attested that he passed this information along to Mr. Paull, who then relied on Mr. Gold's representations to approve the issuance of the loan to Waterdog.  (October 3, 019 Hearing at 10:09 a.m., 11:19 a.m., 11:36 a.m.).

Accordingly, the Whitcombs have failed to provide any evidence demonstrating that Paull & Partners knew, understood, or consented to the Whitcombs' plan.  Mr. Whitcomb's secret plan was, in fact secret.  Paull & Partners did not know of the plan.

The Court has not found a Texas case directly on point.  Accordingly, an *Erie* guess is in order.  *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 530 (5th Cir. 2004).  The Court concludes that Texas law is designed to (i) protect Texas homesteads from being subjected to liens that are constructed by an unscrupulous lender (even with the borrower's consent) to deprive the borrower or homestead protections and (ii) protect Texas homesteads from being subject to liens by allowing homeowners to rely on a condition of defeasance as a mechanism to disclaim the prohibitions of inappropriate liens on homesteads.  39 ALOYSIUS A. LEOPOLD & GERRY W. BEYER, MARITAL PROPERTY AND HOMESTEADS § 27.11 (2019).

But, no Texas case holds that a borrower is allowed to cheat a lender by (i) transferring a homestead to a corporation on the borrower's own volition; (ii) lying to the lender that the corporation was formed for a legitimate business purposes; and (iii) disclaiming the prior statements without any advance notice to the lender.  The Court concludes that the law was designed to protect borrowers from unscrupulous lenders; it was not intended to protect borrowers from their own unscrupulous conduct.  Accordingly, the Court makes an *Erie* guess that the Texas Supreme Court would not recognize a secret condition of defeasance, never disclosed to the lender.

It is one thing to engage in a sham by transferring the property to Waterdog and intending to continue to live in the home.  It is a different sham to never intend to transfer the property to Waterdog at all.  The Court concludes that Mr. Whitcomb intended the former—and not the latter—sham.  Moreover, even if Whitcomb never intended the transfer to occur, his intention—without any understanding by Paull & Partners, would not constitute a condition of defeasance under Texas law.

The scope of the evidence provided by the Whitcombs' begs this court to imply that given the circumstances, Paull & Partners' should have known or should have inquired further in order to discover that the Whitcombs' underlying intention was to effect a sham transaction in order to overcome their financial situation, rather than to carry on a legitimate business through their newly formed corporation.  Even looking at "all circumstances preceding and attending the execution" of the loan, however, the evidence does not show an understanding between the parties at the time of the initial transaction.  *Anglin*, 141 S.W.2d at 939–40.

Consequently, although there is evidence that Paull & Partners would have realized, had it looked, that the conveyance to Waterdog was a sham, there is no evidence before the Court that Paull & Partners knew, understood, or agreed to the Whitcombs' plan.  The Whitcombs were required to show an understanding between themselves and Paull & Partners as to the pretended sale.  The Whitcombs have not met their burden; their defeasance argument fails.

### B.  Loan Modification and Extension: $75,000 to Waterdog

In December 2015, Waterdog contacted Paull & Partners to obtain a loan modification and extension.  (ECF No. 20 at 6).  The parties agreed to increase the outstanding principal of the loan by $75,000.00.  (ECF No. 20 at 6).  As part of the extension, Mr. Whitcomb signed a non-homestead affidavit on December 23, 2015, which stated that Waterdog was the sole owner of

the home and would not claim a homestead exemption over the Property. (ECF Nos. 20 at 6; 20-21; *see* 38 at 15 (noting the document titled "Non-Homestead and Homestead Designation" bore Mr. Whitcomb's signature)). The $75,000.00 was used to pay off the homeowner's association assessment, but Paull & Partners retained a portion of the funds to pay off pending interest payments due under the loan. (ECF No. 20 at 6).[13]

The Court will now address the issue of whether a pretended sale defense exists as to the additional $75,000.00 issued to Waterdog in December 2015.

### i. *Intent to Transfer*

The Whitcombs' intent did not change from the time of the initial transaction to the time of the requested extension and loan modification proceeds. As noted above, the totality of the circumstances demonstrates that the Whitcombs had no intention of transferring valid title to Waterdog; rather, the Whitcombs intended to deceive and evade Texas homestead laws by using a sham entity to own the Property, which would then be used as collateral for the purpose of obtaining loan proceeds.

### ii. *Condition of Defeasance*

The record is clear that at the time that the Whitcombs' requested a modification and extension of the loan, Mr. Paull had received notice of the Whitcombs' homestead claim, and of their continual presence on the Property. (October 3, 2019 Hearing at 9:30 a.m. (acknowledging that he received an email from Mr. Holland, Mr. Whitcomb's attorney at the time, notifying Mr.

---

[13] The Loan Modification and Extension notes:

> Out of the remaining proceeds, $22,113.28 will be applied to the ad valorem taxes now due with the respect to the Property and $5,947.54 will be applied to past due homeowner's association dues and fees.

(ECF No. 20-18 at 3). At trial, Mr. Paull testified that the $22,113.28 in taxes were intended to be paid at closing. That did not occur. Paull blamed Todd Taylor, his attorney at the time, for the oversight. (October 8, 2019 Hearing at 9:55 a.m.).

Paull that the Whitcombs continued to reside in the home and claimed the Property as their homestead)).   Mr. Paull, rather than take steps to investigate Mr. Holland's claim, simply forwarded the email to his attorney, Mr. Taylor.   (October 3, 2019 Hearing at 9:30 a.m. (admitting he did not take any steps to verify or confirm the information provided)).   His lawyer, apparently, also failed to investigate.   The email from Mr. Holland imposed on Mr. Paull, and by operation of law, on Paull & Partners', a duty of inquiry.   *Rubarts,* 896 F.2d at 113 ("But a lender, although without *actual* notice of a debtor's plan to evade the state's homestead provisions, can be charged with *constructive* knowledge by operation of the duty of inquiry.").   Moreover, on December 23, 2015 as part of the extension, Mr. Whitcomb signed a non-homestead affidavit, which indicated that Waterdog was the sole owner of the home and would not claim a homestead exemption over the Property.   (ECF Nos. 20 at 6; 20–21; 38 at 5).   Paull & Partners did not provide an explanation for the additional requirement under the modification and extension.   The inconsistency between the letter and the affidavit was more than adequate to place Paull & Partners on notice of the sham.

"[I]n determining whether an instrument is to be construed as an absolute conveyance or a mortgage when there is no defeasance expressly agreed upon or recited in the deed, *equity looks to all circumstances preceding and attending the execution of the instrument, and sometimes those which have subsequently occurred*."   *Anglin*, 141 S.W.2d at 939–40 (emphasis added).   Importantly, the notice that triggered Paull & Partners' duty of inquiry was provided *prior* to Paull & Partners' approval of the loan's extension and modification.   (October 3, 2019 Hearing at 9:20 a.m.).   Therefore, at the time the Whitcombs requested an extension and modification of Waterdog's loan, Paull & Partners had actual knowledge that Waterdog was not

using the Property for the purpose of carrying on a business.  Had Paull & Partners inquired further, it would have learned that Whitcomb never intended for Waterdog to own the home.

It is important to reiterate the uniqueness of this case.  The Court is unable to locate any Texas authority dealing with a pretended sale where the sham is organized and perpetrated by the borrower, without the lender's actual knowledge.

In accordance with the Court's *Erie* guess above, the Court holds that when the sham transfer is organized by the borrower and without the lender's participation or actual knowledge, no duty of inquiry arises under Texas law until the lender is on notice or otherwise gains actual knowledge of the sham.  Because Paull & Partners learned of the sham after it advanced the $800,000.00, but before it advanced the $75,000, the Court finds that although no duty of inquiry arose as to the $800,000.00 loan, a duty of inquiry did arise as to the $75,000.00 as part of the modification and extension of the loan.

Approval of the Whitcombs' request for additional funding following the notice letter from Mr. Whitcomb's lawyer places the $75,000.00 well outside the bounds of reason.  At the time of the $75,000.00 loan, Paull & Partners were on actual notice that the original conveyance was not to conduct a legitimate business.  *Rubarts,* 896 F.2d at 114 ("Given this intent on the part of the debtors, the only remaining inquiry under, e.g. *Eylar* is whether First Texas was entirely an innocent participant or whether, instead, it can be charged with constructive knowledge of the pretended sale.").

Accordingly, Paull & Partners' approval of the $75,000.00 as part of an extension and modification of the loan, implies a condition of defeasance—an understanding that "the deed was executed and delivered by one party, and received by the other, upon the understanding and with the intention that it should only be a security for a debt" owed.  *Hardie*, 63 Tex. at 296.  The

$75,000.00 in loan proceeds was part of a pretended sale, and therefore Paull & Partners' lien on the portion of those funds is invalid under the Texas Constitution.

## II. Contractual Subrogation

As noted above, the initial loan transaction closed on September 4, 2015, shortly after Waterdog's formation and only three days after the Whitcombs' conveyance of their interests in Property to Waterdog. (ECF Nos. 20 at 6; 22 at 2). Pursuant to the terms of the loan, Paull & Partners provided $800,000.00 to Waterdog. (ECF No. 20 at 6). In exchange, Mr. Whitcomb signed a promissory note and a deed of trust, in his capacity as Waterdog's managing member. (ECF No. 20 at 6). Mr. Whitcomb also signed a personal guaranty as a requisite for funding the loan. (ECF Nos. 20 at 6; *see* 20-13). The funds of the loan paid Cadence Bank $443,729.45 to release its purchase money mortgage on the Property and $45,406.54 to Hunter-Kelsey II to release the tax relief agency's interest in the Property. (ECF No. 20 at 6). The remaining $310,864.01 of the loan proceeds remained with Waterdog.

In its previous opinion, the Court held that Paull & Partners was entitled to contractual subrogation in light of the fact that the proceeds of the initial loan transaction were used to pay off a lien arising from purchase money and a tax lien, neither of which fall within Texas' broad homestead protection laws. (ECF No. 36 at 19).

Post-trial Mr. Whitcomb filed a motion to reconsider based on this Court's ruling in favor of Paull & Partners on the issue of contractual subrogation. (*See* ECF No. 46). Mr. Whitcomb, relying largely on *Zepeda v. Fed. Home Loan Mortg. Corp*., 935 F.3d 296 (5th Cir. 2019), argues that this Court should hold, just as the Fifth Circuit held in *Zepeda*, that contractual subrogation is not available when the underlying deed of trust at issue is invalid. (ECF No. 46 at 2–3). Thus,

he argues that the Court should overturn its ruling that granted Paull & Partners contractual subrogation on the totality of the loan.  (ECF No. 46 at 3).

On September 26, 2019, Paull & Partners filed a brief for final hearing and a response to Mr. Whitcomb's motion, both of which opposed the relief requested.  (*See* ECF Nos. 48–49). Paull & Partners distinguishes *Zepeda* from the issues at play in the case before the Court.  (*See* ECF No. 48 at 14).  Paull & Partners argues that *Zepeda* does not apply, because *Zepeda* dealt with a home equity loan, rather than a pretended sale, and the lender in *Zepeda* knew the loan contained a deficiency—a violation under Article XVI, § 50(a)(6) of the Texas Constitution— which the lender failed to correct within the statutorily required 60-day time frame after notice from the borrower and opportunity to cure.  (ECF No. 48 at 14).  Thus, it argues that the Whitcombs' reliance on *Zepeda* is misplaced.

### *The Initial Transaction: $800,000.00 to Waterdog*

In light of the Court's finding that Paull & Partner's lien is valid as to the initial $800,000.00, the contractual subrogation issue is moot.

### *Loan Modification and Extension: $75,000.00 to Waterdog*

Paull & Partners have not indicated or argued that the additional $75,000.00 in proceeds fall within a constitutionally protected exemption as they did for the initial loan.  The Court is unaware of any facts that would allow subrogation for the additional $75,000.00.  Therefore, contractual subrogation need not be addressed as to the $75,000.00.

### III. Equitable Subrogation

In light of the Court's ruling, the equitable subrogation issue is moot.

IV. **Personal Liability**

In light of the Court's holding that the lien is valid as to the initial $800,000.00, Mr. Whitcomb remains personally liable to Paull & Partners for the principal and interest due on that portion of the Note.  His personal liability is, of course, subject to any bankruptcy discharge that he may receive.

The Court, however, has found that as to the additional $75,000.00 there was a pretended sale.  At closing arguments, Mr. Whitcomb argued that the adequate remedy under the Texas Constitution for a pretended sale was forfeiture as to all principal and interest.  (October 11, 2019 Hearing at 2:25 p.m.).  The Court disagrees.  As set forth in this Court's previous Memorandum Opinion, "Texas courts have held that § 50(a)(1) of the Texas Constitution provides a homeowner with protection from foreclosure rather than a remedy of forfeited principal and interest."  (ECF No. 36 at 21 (citing *Garofolo v. Ocwen Loan Serv., LLC*, 497 S.W.3d 474, 478– 79 (Tex. 2016)).  Therefore, Mr. Whitcomb is not entitled to forfeiture.  *See Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542, 551 (Tex. 2016) ("[S]ection 50(a) does not create substantive rights beyond a defense to a foreclosure action on a home-equity lien securing a constitutionally noncompliant loan and [] forfeiture is not a constitutional remedy." (citing *Garofolo*, 497 S.W.3d at 478)).  Thus Mr. Whitcomb remains personally liable on the principal and interest as to the additional $75,000.00, subject to discharge, if any.

## Conclusion

The Court will issue Judgment consistent with this Memorandum Opinion.

SIGNED **June 17, 2020.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE